# Exhibit A

Employer Agreement #
**0109031200**

| | Term Contract (Rider must be attached.) If not checked, this contract is a Standard Minimum Contract. |
|✔| |

# Actors' Equity Association
## SHORT ENGAGEMENT TOURING CONTRACT
TO BE ISSUED TO ACTORS PERFORMING AS **PRINCIPALS,** or **STAGE MANAGERS**
*(Must be signed by Actor and Producer before first rehearsal)*

**Agreement** made this _____**3rd**_____ day of __**December**__ 2**022**__, between the undersigned Producer and __**ZURI WASHINGTON**__, hereinafter "Actor".

1. The Actor shall play (specify role for Principal; position and additional duties for Stage Manager) **ROBERT LIVINGSTON**_____

in the play now called " **1776** ."

2. **FIRST PAID PERFORMANCE**. The date of the first paid performance shall be the __**14**__ day of __**FEB**__, 2 **023**__, or not later than 14 days thereafter. Employment shall commence on the date of the beginning of rehearsals which date shall not be earlier than six weeks (or seven weeks in the case of musicals) prior to the first paid performance date as set forth herein.

3. **COMPENSATION**. The Producer shall pay the Actor the sum of **(see rider)**_____ dollars ($ **(see rider)**__) for each week of employment during the rehearsal period and shall pay the sum of **(see rider)**_____ dollars ($ **(see rider)**__) for each week of employment commencing with the first paid public performance.

In addition, the Actor shall receive the sum of $ **(see rider)**__ for out-of-town expenses in accordance with the Agreement and Rules Governing Employment in Short Engagement Tours (hereinafter "Agreement" or "Rules"). No reduction of this compensation shall be binding on the Actor without the written consent of Actors' Equity Association (hereinafter "Equity"). All weekly compensation due shall be paid no later than the day before the last banking day of the week.

4. **RULES**. The Producer recognizes Equity as the exclusive bargaining representative of the Actor for the purpose of collective bargaining and the administration of matters within the scope of the Agreement. Both the Producer and the Actor agree that every provision, including the arbitration provision, contained in the Rules, is and becomes a part of this contract, as though set forth at length herein; they have read said Rules and admit actual notice and knowledge of same; every term of said Rules is of the essence of the contractual relationship between them; said Rules set forth the minimum conditions under which the Actor may work for the Producer; and said Rules may not be waived or modified without the written consent of Equity.

5. **SECURITY**. It is the of the essence of this contract and a condition precedent to the engagement of the Actor that the Producer shall file and shall at all times maintain with Equity security satisfactory to it as required by the Security Agreement and the Rules.

6. **AUTHORIZATION.** The Actor hereby assigns to Equity from any compensation to be earned in connection with this contract, such amounts for dues and initiation fees (or the monetary equivalents thereof) certified by Equity as due, and authorizes and directs the deduction of such amounts from Actor's compensation and the remission of the same to Equity. This assignment, authorization and direction covers all compensation earned as a result of employment under this contract including compensation earned pursuant to Rule 70, provided that with respect to such compensation, Equity has first required that payment thereof be made by the Producer to the Actor. This assignment, authorization and direction shall remain in effect and be irrevocable, and shall be continued automatically, unless Actor revokes it by giving written notice to the Producer and Equity by registered mail not more than 30 days and not less than 15 days prior to the expiration of each successive one year period or of each successive Agreement, whichever occurs sooner. Such revocation shall become effective the first day of the calendar month following its receipt. This clause shall be operative unless stricken by the Actor in which case the Actor is liable for direct payment of dues (or the monetary equivalent thereof) to Equity to the extent permitted by law. If the Actor elects to strike this clause and to make any legally required payments directly to Equity, and is in default of any such payments, the Actor may be subject to discharge from employment for such delinquency.

7. **SIGNATURE**. The Producer agrees that execution of this contract binds not only the producing company but also the individual signatory to this contract as well as any person under whose authority this contract is executed.

By: *Gregory Vander Ploeg*
Producer's Signature (MUST SIGN FIRST)

**1776 Touring, LLC**
Name of Producing Organization

**Columbia, MD**
City and State

**0100048756**
Unemployment Insurance Registration Number

**Hell's Kitchen Agency**
Agent (if any)

**ZURI WASHINGTON**
Actor's Name (PLEASE PRINT)

*Zuri*
Actor's Signature

1015 Grand Concourse Apt 2G
Address

Bronx, NY, 10452
City, State, Zip Code

165467
AEA Member ID or Last 4 of SSN (One must be provided.)

**COPY (Check One): ACTOR** ☐  **PRODUCER** ☐  **AGENT** ☐  **ACTOR COPY TO EQUITY** ☐  **PRODUCER COPY TO EQUITY** ☐

3/5/09 RAB

THIS RIDER DATED AS OF **December 3rd , 2022** ATTACHED AND MADE PART OF THE ACTORS' EQUITY ASSOCIATION SHORT ENGAGEMENT TOURING AGREEMENT ("SETA") FOR ACTORS PERFORMING AS PRINCIPALS DATED **December 3rd, 2022** BY AND BETWEEN **1776 TOURING, LLC** (HEREINAFTER REFERRED TO AS "PRODUCER") AND **ZURI WASHINGTON** (HEREINAFTER REFERRED TO AS "ACTOR") IN CONNECTION WITH THE PRODUCER'S BUS AND TRUCK TOUR ("TOURING COMPANY") OF THE MUSICAL PLAY "**1776**" (HEREIN AFTER REFERRED TO AS THE "PLAY").

1. ROLE: Robert Livingston / Principal Understudy Assignments: John Adams, Abigail Adams/Rev. John Witherspoon, The Courier

2. REHEARSAL DATE

    The Actor and Producer acknowledge and mutually agree that the Actor shall have non-consecutive rehearsal weeks, and said rehearsal weeks are anticipated to be on or about:

    - Two Weeks: Monday, December 5 – Saturday, December 17, 2022; New York, NY
    - One week: Thursday, January 5 – Friday January 6, 2022; New York, NY
    - One week: Monday, February 6th – Sunday, February 12th, 2023; Utica, NY

3. TERMINATION

    This shall be a standard Term contract for a period of employment equal to Twenty-Five (25) calendar weeks and whereas the Producer shall guarantee the Actor with not less than two (2) weeks of employment; commencing with the date of the Actor's first paid public performance hereunder, currently scheduled to be on or about Tuesday, February 14th, 2023 in Philadelphia, PA and continue through Sunday August 13th, 2023 in Seattle, WA; subject to earlier termination in accordance with the rules and regulations of AEA. Company closing may be affected upon one (1) week's written notice at any time during the term hereof in accordance with AEA rules.

4. COMPENSATION

    a. Commencing with the first day of rehearsals on or about Monday, December 5, 2022, in New York, NY, the Actor shall receive a salary as follows, which shall be on a most favored nations basis with all other actors, pro-rated per AEA rules:

    | | |
    |---|---|
    | Category 3 minimum (pre-recoupment): | $885.00 |
    | Media Fee (2% of minimum) | $17.70 |
    | Total Rehearsal Compensation | $ 902.70 |

    b. Commencing with the first paid performance on or about Friday, February 10th, 2023, in Utica, NY the Actor shall receive a salary equal to the following, which shall be on a favored nations basis with all company members at minimum plus applicable assignments; pro-rated per AEA rules:

    | | |
    |---|---|
    | Category 3 minimum (pre-recoupment): | $885.00 |
    | Media Fee (2% of minimum) | $17.70 |
    | Term Increment | $160.00 |
    | Total Compensation | $1,062.70 |

    c. Commencing with the Official Opening Performance on or about Tuesday, February 14th, 2023 in Philadelphia, PA the Actor shall receive a weekly salary equal to the following; pro-rated per AEA rules:

    | | |
    |---|---|
    | Category 3 minimum (pre-recoupment): | $885.00 |
    | Media Fee (2% of minimum) | $17.70 |
    | Principal Understudy (John Adams) | $33.75 |
    | Principal Understudy (Abigail Adams/Rev. John Witherspoon) | $33.75 |
    | Principal Understudy (The Courier) | $33.75 |
    | Term Increment | $160.00 |
    | Total Compensation | $1,163.95 |

    d. Pursuant to the request by the Actor, Producer agrees to deduct an agent's commission (5% of Actor's gross weekly rehearsal salary; 10% of Actor's gross weekly performance salary) each week and remit to Actor's agent directly to:

    Hell's Kitchen Agency. a/a/f Zuri Washington
    1501 Broadway, 12th Floor
    New York, NY 10036
    Attn: Brian Graziani

e.   The Actor shall declare that their "Tax Home" will be the same as Actor provides to Producer on Actor's W-4 form. If Actor wishes to change their "Tax Home", he may do so by providing Producer with written documentation including the details of this change.

f.   All payments provided for in this rider shall be prorated for partial playing weeks in accordance with the Agreement and Rules Governing Employment Under the SETA Contract.

g.   Payment of salary and per diem shall be processed in accordance with Rule 57(I) as follows:

   a.   Payment of per diem shall be processed no later than Thursday in each week of employment in which it is due;

   b.   Payment of Actor salary shall be processed no later than Thursday of the week following the work week. In the first week of employment, Producer shall pay no less than one-half of the week's applicable salary, and in the second week of employment Producer shall pay the remainder of the previous week's applicable salary, such that in the third week of employment the Producer will be paying the full applicable salary to the Actor for the work performed in the second week, and similarly for each week thereafter.

   c.   Salary earned in the week prior to a lay-off shall be paid in the week of return from the lay-off, unless the Actor's employment has terminated.

5.   SETA PARTICIPATION

Actor shall be entitled to SETA "Participation" as defined by AEA, subject to AEA rules regarding the same, beginning with the first paid public performance.  All Actors earning less than three times the Production Contract minimum, exclusive of all required increments, will be entitled to participate in the Producers share of Overages, in addition to their weekly contractual salary and the Actor shall be provided the applicable post-recoupment participation beginning with the Official Opening Performance of the Touring Company.

   a.   Pre-recoupment: Actor shall receive .275% of the Producers share of Overages.
   b.   Post-recoupment: Actor shall receive .40% of the Producers share of Overages.

6.   UNDERSTUDY ASSIGNMENT / PRINCIPAL UNDERSTUDY

It is agreed and understood that there may be more than one understudy for a specific role. It is further agreed and understood that which understudy performs will be at the Producer's discretion and The Producer and Actor acknowledge that all principal understudy payments, shall be on a most favored nations basis with other principal understudies and per Rule 67(D)(1)(a), understudies shall be provided a payment equal to one-eighth (1/8th) of the actor's own contractual salary for any performance in which Actor appears in such understudy to a principal.

7.   BILLING AND BIOGRAPHY

   a.   Actor shall be billed on the Title Page in alphabetical order and Cast of Characters page in order of appearance.

   b.   Producer agrees to include an approved Biography of Actor in the Playbill and such biography shall be limited to biographical data and professional credits only. Furthermore, Chorus and Stage Managers shall be limited to a maximum of four (4) lines, exclusive of the Actor's name and parts/role played, of biographical data and professional credits.

8.   COSTUMES

It is understood and agreed that per rule 13(E) all Swings and Understudies will not be provided with their own individual costumes, except for articles mentioned in rule 13(E) paragraph (1).

9.   PROMOTIONS / PUBLICITY / RECORDING AND BROADCAST

   a.   It is hereby understood and agreed that Actor's press obligations are intrinsic to the production therefore, Actor agrees to make themselves available for *reasonable* personal appearances and/or publicity events including but not limited to interviews for newspapers, magazines and other publications; appearances or interviews on radio and television; and any other press events that may be scheduled in connection with the promotion and publicizing of the Play, without additional compensation except for reimbursement of actual out-of-pocket expenses incurred by Actor and approved by Producer, or as may otherwise be required in accordance with Actors' Equity Association rules and regulations.

   b.   Subject to Actors' Equity Association rules and regulations, Actor hereby agrees that he/she will make no press appearances using material from the Play unless Producer or its designated representative has approved in advance any and all such press appearances.

   c.   The Actor agrees that the Producer may record material from the production as defined in Rule 36 for the purposes of promotion and publicity and used in accordance with Rule 36(A)(2) in perpetuity for any Equity production of the Play produced by the Producer.

d. Actor agrees to the use of any video and/or audio footage containing Actor's image, likeness or voice on any radio or television show promoting the Play provided such use is in accordance with Rule 36(C), Rule 36(D) and 36(E).

e. Actor hereby acknowledges and agrees that Producer shall have the perpetual right to utilize Actor's photograph or likeness in promotion, publicity and advertising for the Play subject to the applicable rules and regulations of Actors' Equity Association with no additional compensation to Actor except as provided for in Rule 36(A)(3).

f. Actor agrees to the use of any recorded materials containing Actor's image, likeness or voice at the prevailing minimum rate for each use as provided for in Rule 36(A)(3) (Media Fee). It is specifically understood, Actor shall be deemed to have granted Producer the perpetual right to use Actor's likeness in perpetuity for any Equity production of the Play produced by the Producer as provided for in Rule 36(A)(2)(d).

g. Upon the request of Producer, Actor agrees to participate in one or more radio and/or television documentaries about the making of the Play, the making of the cast album, or a similar type documentary at the prevailing minimum rates and the applicable minimum terms and conditions of the union under whose jurisdiction the documentary is made (if any) and in accordance with Rule 36(E) of the Agreement and Rules Governing Employment Under the SETA Contract.  Further, Actor agrees that Producer may utilize existing performance and/or rehearsal footage as defined in Rule 36(E)(a) and (b) in documentaries without payment, except as provided for as set forth in Rule 36(E)(c).

10. PLACE OF RESIDENCE / ACCOMMODATIONS &  PER DIEM
   The Producer and Actor agree that the Actor's accommodations and per diem shall be provided per Rule 28 of the Agreement and Rules Governing Employment under the SETA Contract (except as provided in Rule 28(A)(F) as applicable) and the Actor's Place of Residence shall be New York, NY.

11. TRANSPORTATION
   a. Actor agrees to travel by economy air and/or surface transportation at the direction of the Producer and in accordance with the rules of Actors' Equity Association.

   b. Contrary to the new SETA Baggage Rule 66(F) the Producer shall allow the Actor to transport checked baggage equal to two (2) full-sized suitcases and shall be limited to 50 pounds each, plus carry-on luggage. Any cost resulting from baggage being greater than 50 pounds imposed by any carrier shall be borne solely by the Actor.

   c. The Producer shall provide and transport, at the Producer's cost, one (1) trunk for Actor's sole use to be delivered to the theater at each location, if possible. Otherwise, the Actors shall be provided access to these containers no less frequently than at the beginning and again at the end of each engagement.

   d. When the Actor is permitted, and elects, to travel on Actor's own, Producer shall have no responsibility regarding transporting Actor's carry-on and checked baggage, or for any costs associated with the transportation of said baggage under Rule 66(F)(6).

   e. It is further understood and agreed that no persons, other than employees of Producer engaged for the Play, shall be permitted to be transported on any bus, van, automobile, or other form of long-distance or local ground transportation furnished by Producer.

12. FIREARMS / STAGE FIGHTING & STUNTS
   INTENTIONALLY DELETED

13. PETS
   Actor agrees not to travel with pets or animals of any kind.

14. LAYOFFS
   a. It is understood and agreed that layoffs may be scheduled in accordance with Rule 35(A) of the Agreement and Rules Governing Employment Under the SETA Contract.

   b. It is understood and agreed that the following layoffs have been scheduled in accordance with Rule 35(A)(2) with the permission of Actors' Equity Association:

      An unpaid one (1) week layoff commencing 5/22/23 through 5/28/23

15. HOLIDAYS
   Actor agrees to perform on any and all Holidays as requested by Producer.

16. PERSONAL DAYS AND VACATION
   a. Actor agrees that per Rule 30(H)(3) and (6); Personal Days may not be taken during the week between Christmas and New Year's, except for extraordinary circumstances; and Personal Days will not be granted until after the press opening of the first engagement and not be granted on the actual press opening nights of the second and third engagements of a tour, and on the press opening night of any engagement of two weeks or longer.

   b. Actor agrees that per Rule 70(A)(2), vacations may not be taken within 12 weeks of the official opening at the first engagement, without the Producer's consent.

17. HAIR

Actor agrees to allow Producer to alter Actor's hairstyle (including color and length) for the duration of this contract. Any alteration and maintenance for altered hairstyle requested by Producer and restoration of Actor's hair to its original color shall be provided at Producer's sole expense. During the term of this contract, Actor shall make no alterations to Actor's hair without the express written permission of Producer.

18. TAN/TATTOOS

Actor agrees to avoid excessive exposure to the sun, "sun lamps" or similar tanning equipment, which could result in the significant changes in Actor's normal skin color. Actor agrees not to apply either a permanent or temporary tattoo without the express written permission of Producer.

19. SPECIAL EFFECTS

Actor understands and agrees to the use of special effects in the Play including pyrotechnics and smoke and fog utilizing substances including but not limited to dry ice, Rosco juice and any other substances approved for use in accordance with Rule 56(H)(2) of the Agreement and Rules Governing Employment Under the SETA Contract.

20. SMOKING

Actor acknowledges that there may be smoking on stage during the action of the Play. The foregoing notwithstanding, Actor agrees to abide by all local, state and federal laws and/or regulations regulating smoking.  The Producer has designated the following areas as non-smoking areas, the auditorium, dressing rooms and backstage.

21. OWNERSHIP
   a. It is hereby agreed that any material whatsoever, including any form of "stage business" performed by  Actor in rehearsals or any performance of the Play, shall, insofar as Actor is concerned, be the property of Producer and/or the Authors of the Play, as their respective interests may appear.

   b.  During the term of this contract, Actor shall not render any services in connection with or perform in anyway any material or musical compositions written for or contained in the Play, on Actor's own behalf or on the behalf of anyone other than the Producer, for any purpose whatsoever other than as part of the performance of Actor's role in the Play hereunder, without the prior written consent of Producer.

22. REPRESENTATIONS & WARRANTIES, EXCLUSIVITY OF SERVICES

The Actor represent and warrant that Actor has not limited, by agreement with others, Actor's right to perform services hereunder. Actor further represent and warrant that Actor has not heretofore entered into any contract or undertaken any commitment in conflict with this agreement and that Actor shall not accept any engagement in the entertainment field or otherwise for the rendition of Actor's services which may or shall interfere with the proper and timely rendition and performance of Actor's services and obligations hereunder. Actor agrees that Actor's primary obligation is to render Actor's services in the Play, as required hereunder, to the best of Actor's ability. Without limiting the foregoing, it is acknowledged and agreed that the services to be rendered by Actor hereunder are of a special and unique value and character, the loss of which due to Actor's absence could cause Producer irreparable injury and/or damage. In the event of such loss, Producer shall be entitled to any and all rights or remedies available to it. Actor agrees to indemnify and hold harmless Producer and Producer's principals and affiliates from and against any and all claims, liabilities, losses, damages, judgments, costs and expenses arising out of the breach of any warranty, representation or agreement made by Actor hereunder.

23. NON-DISCRIMINATION AND ANTI HARASSMENT POLICY

Actor acknowledges receipt of Producer's Non-Discrimination and Anti-Harassment Policy attached hereto and deemed incorporated herein. Actor agrees to read the policy thoroughly, including the "Complaint Procedure." Actor also agrees that if there is any provision in the policy that Actor does not understand, Actor will seek clarification from the General Manager, Company Manager or Production Stage Manager.

24. COVID 19

    a.    This agreement shall be expressly subject to i) any change in scheduling implemented by Producer as a result of  health and safety considerations arising from the COVID-19 health emergency, ii) any prospective union or government guidance which may cause Producer to alter the structure of the engagement or abandon it altogether and iii) Actor's agreement that they will strictly adhere to the protocols that are deemed necessary by Producer to proceed with the engagement in a safe and protective manner.

    b.    Further, it is a condition of this agreement, that the Actor will be fully vaccinated (as defined by the CDC) with respect to Covid-19 (providing evidence of such vaccination) prior to the first rehearsal.

    c.    Actor agrees to adhere, to the best of their ability, to the AEA safety protocols, attached hereto and deemed incorporated herein and Producer's safety protocols prepared to minimize the transmission of Covid-19, as approved by the Producer's health specialists; in addition to any local, city, provincial and national requirements known or unknown that Producer makes available to the Actor

AGREED AND ACCEPTED:

BY: _____
Zuri Washington

12/10/2022
Date

AGREED AND ACCEPTED:
1776 Touring, LLC

BY: _____
Gregory Vander Ploeg
Senior Director, General Management

12/09/2022
Date



**165 WEST 46th STREET**
**NEW YORK, NY  10036**

SHORT ENGAGEMENT TOURING CONTRACT
TOURING COMPANY RIDER

1) Short Engagement Touring Contract Category:

☐ Category 1                ☐ Category 4

☐ Category 2                ☐ Category 5

☒ Category 3                ☐ Category 6

2) Actor understands and agrees that transportation during this tour may be by bus.  All provisions of the Equity Rules Governing Employment Under the Equity/League Short Engagement Touring Contract will apply.

3) The Producer will use best efforts to book the tour so that the Actor will have as little travel as possible.  However, it is understood that consecutive one-night engagements may be required under this contract.

4) It is understood that, in addition to the cast and required management representatives, the bus(es) will also carry (check) crew __X__, musicians _X_, no one _____.  It is understood that (except by express consent of management) no persons shall be allowed to ride on the bus with the Company unless they are a bona fide employee engaged for the tour.

5) The Actor is guaranteed a (check) single __X__ double* _____ seat.  This guarantee will not apply in emergency situations if a substitute vehicle is required, or if occupants of two buses are forced to double up. [* "Double seat" means the Actor will not be required to share the seat.]

6) No pets shall be allowed on company buses without the express consent of management.

7) In the event that the Producer contemplates using any lay-off provisions of the contract (no single lay-off to exceed four weeks), this paragraph must be initialed at the time of signing of this contract.

It is acknowledged that the Producer may lay-off the company for the number of weeks equivalent to 25% of the total number of weeks in the tour.  While it is understood that the lay-offs may be reduced or eliminated, in no event may lay-offs be utilized if this section is not completed at time of signing of the contract.

_____ Actor

_____ Producer

_____          Gregory Vander Ploeg
_____          _____
Actor                                                    Producer

12/10/2022                                     12/09/2022
_____          _____
Date                                                     Date

Revised/AEA 7/2009

**1776 THE MUSICAL *subject to change**
(tour route follows)

| From | To | Wk # | Op Wk # | City ('perf') |
|------|-----|------|---------|---------------|
| - | - | - | - | - |
| 6-Feb-23 | 12-Feb-23 | 0 | 0 | Utica, NY (tech) |
| 13-Feb-23 | 19-Feb-23 | 1 | 1 | Philadelphia, PA |
| 20-Feb-23 | 26-Feb-23 | 2 | 2 | Philadelphia, PA |
| 27-Feb-23 | 5-Mar-23 | 3 | 3 | Chicago, IL |
| 6-Mar-23 | 12-Mar-23 | 4 | 4 | Chicago, IL |
| 13-Mar-23 | 19-Mar-23 | 5 | 5 | Des Moines, Ia |
| 20-Mar-23 | 26-Mar-23 | 6 | 6 | Denver, CO |
| 27-Mar-23 | 2-Apr-23 | 7 | 7 | Denver, CO |
| 3-Apr-23 | 9-Apr-23 | 8 | 8 | Los Angeles, CA |
| 10-Apr-23 | 16-Apr-23 | 9 | 9 | Los Angeles, CA |
| 17-Apr-23 | 23-Apr-23 | 10 | 10 | Los Angeles, CA |
| 24-Apr-23 | 30-Apr-23 | 11 | 11 | Los Angeles, CA |
| 1-May-23 | 7-May-23 | 12 | 12 | Los Angeles, CA |
| 8-May-23 | 14-May-23 | 13 | 13 | San Diego, CA |
| 15-May-23 | 21-May-23 | 14 | 14 | San Jose, CA |
| 22-May-23 | 28-May-23 | 15 | - | LAYOFF |
| 29-May-23 | 4-Jun-23 | 16 | 15 | Durham, NC |
| 5-Jun-23 | 11-Jun-23 | 17 | 16 | Charlotte, NC |
| 12-Jun-23 | 18-Jun-23 | 18 | 17 | Greenville, NC |
| 19-Jun-23 | 25-Jun-23 | 19 | 18 | Nashville, TN |
| 26-Jun-23 | 2-Jul-23 | 20 | 19 | Washington, DC |
| 3-Jul-23 | 9-Jul-23 | 21 | 20 | Washington, DC |
| 10-Jul-23 | 16-Jul-23 | 22 | 21 | Washington, DC |
| 17-Jul-23 | 23-Jul-23 | 23 | 22 | Houston, TX |
| 24-Jul-23 | 30-Jul-23 | 24 | 23 | Kansas City, MO |
| 31-Jul-23 | 6-Aug-23 | 25 | 24 | Seattle, WA |
| 7-Aug-23 | 13-Aug-23 | 26 | 25 | Seattle, WA |

## NON-DISCRIMINATION & ANTI-HARASSMENT POLICY

**1776 Touring, LLC** ("Company") is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits discriminatory practices, including harassment. Therefore, the Company expects that all relationships among persons in the workplace will be business-like and free of bias, prejudice, and harassment.

It is the policy of the Company to ensure equal employment without discrimination or harassment on the basis of race, color, national origin, religion, sex, gender, age, disability, citizenship, marital status, sexual orientation or any other characteristic protected by law. The Company prohibits and will not tolerate any such discrimination or harassment.

**Definitions of Harassment:**
A. Sexual Harassment constitutes discrimination and is illegal under federal, state, and local laws. For the purpose of this policy, sexual harassment is defined, as in the Equal Employment Opportunity Commission Guidelines as 'unwelcome sexual advances, requests for sexual favors and other verbal or physical harassment of a sexual nature' when, for example: a) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; b) submission to or rejection of such conduct by an individual is used as the basis for employment decision affecting such individual; or c) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Sexual Harassment and conduct that may create a sexually hostile work environment may include a range of subtle and not so subtle behaviors and may involve individuals of the same or different gender. Depending on the circumstances, these behaviors may include but are not limited to: unwanted sexual advances or requests for sexual favors, sexual jokes and innuendo, verbal abuse of a sexual nature, commentary about an individual's body, discussion about sexual thoughts, fantasies, or activities, sexual prowess or sexual deficiencies, leering, catcalls, unwelcome touching, suggestive, insulting or obscene comments or sexual gestures with hands or body, displaying sexually explicit magazines, circulation in the workplace of sexually suggestive objects or pictures (including through e-mail), and other physical, verbal or visual conduct of a sexual nature.

B. Harassment on the basis of any other protected characteristic is strictly prohibited. Under this policy, harassment is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of their race, color, national origin, religion, sex, gender, age, disability, citizenship, marital status, sexual orientation, or any other characteristic protected by law or that of their relatives, friends or associates, and that; a) has the purpose or effect of creating an intimidating, hostile or offensive work environment; b) has the purpose or effect of unreasonably interfering with an individuals' work performance; or c) otherwise adversely affects an individual's employment opportunities.

Harassment on the basis of a protected characteristic includes, but is not limited to epithets, slurs or negative stereotyping, threatening, intimidating or hostile acts, denigrating jokes and display or circulation in the workplace (including through e-mail) of written or graphic material that denigrates or shows hostility or aversion toward an individual or group with a protected characteristic.

**Individuals and Conduct Covered:**
These policies apply to all applicants and Company Members, and prohibit harassment, discrimination and retaliation whether engaged in by fellow Company Members, by a supervisor or manager or by someone not directly connected to the Company (i.e. an outside vendor, consultant or customer).

Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business trips, business meetings, and business-related social events.

**Retaliation is Prohibited:**
Retaliation is prohibited against any individual who reports discrimination or harassment or participates in an investigation of such reports. Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary actions.

**Reporting an Incident of Harassment, Discrimination or Retaliation:**
The Company strongly urges the reporting of all incidents of discrimination, harassment, or retaliation, regardless of the offender's identity or position. Individuals who believe they have experienced conduct they believe to be contrary to the Company's policy or who have concerns about such matters should file their written complaints with the CM or ACM, the PSM or ASM(s), or the General Manager. Individuals should not feel obligated to file their complaints with their immediate supervisor before bringing the matter to the attention of other Company representatives identified above. This information will be kept confidential, except as needed to investigate the reported misconduct.

Early reporting and intervention have proven to be the most effective methods of resolving actual or perceived incidents of harassment. Therefore, while no fixed reporting period has been established, the Company strongly urges the prompt reporting of complaints or concerns so that rapid and constructive action can be taken.

The availability of this complaint procedure does not preclude individuals who believe they are being subjected to harassing conduct from promptly advising the offender that their behavior is unwelcome and requesting that it be discontinued.

**The Investigation:**
Any reported allegations of harassment, discrimination, or retaliation will be investigated promptly. The investigation may include individual interviews with the parties involved and, where necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge.

Confidentiality will be maintained throughout the investigative process to the extent consistent with adequate investigation and appropriate corrective action.

**Responsive Action:**
Misconduct constituting harassment, discrimination, or retaliation will be dealt with appropriately. Responsive action may include, for example, training, referral to counseling, and/or disciplinary action such as warning, reprimand, withholding of a promotion or pay increase, reassignment, temporary suspension without pay, or termination without notice, as the Company believes appropriate under the circumstances.

Individuals who have questions or concerns about these policies should speak to the CM or General Manager.

Finally, these policies should not, and may not, be used as a basis for excluding or separating individuals on the basis of sex, or any other protected characteristic, from participating in business or work-related social activities or discussion in order to avoid allegations or harassment. The law and the policies of our Company prohibit disparate treatment on the basis of sex or any other protected characteristic with regard to terms, conditions, privileges and perquisites of employment. The prohibitions against harassment, discrimination, and retaliation are intended to complement and further these policies, not to form the basis of an exception to them.



# Actors' Equity Association  /  The Broadway League

# Health & Safety Protocols:
# Touring Productions

**As of October 12, 2022**

## TABLE OF CONTENTS

| | |
|---|---|
| **INTRODUCTION** | **3** |
| **COMMUNICATION, TRAINING AND EDUCATION** | **3** |
| **INDIVIDUAL RESPONSIBILITY FOR COVID-19 PREVENTION AND MITIGATION** | **3** |
| **CDC COMMUNITY RISK LEVEL FRAMEWORK** | **4** |
| **MASKS** | **4** |
| **DISINFECTION AND MAINTENANCE** | **5** |
| **AUDIENCE RELATED** | **5** |
| **ESSENTIAL VISITORS** | **6** |
| **OVERSIGHT AND LEADERSHIP/COVID-19 SAFETY MANAGER** | **6** |
| **REQUIRED MEETINGS** | **6** |
| **TESTING** | **7** |
| **SYMPTOM MONITORING AND PROTOCOLS FOLLOWING A POSITIVE TEST** | **8** |
| **LOCAL PERSONNEL** | **10** |
| **SICK LEAVE** | **10** |
| **VACCINATION** | **10** |
| **UNVACCINATED PERSONNEL IN THE WORKPLACE** | **10** |
| **ISSUE RESOLUTION** | **11** |
| **TERM OF THIS AGREEMENT** | **11** |
| **ACKNOWLEDGEMENT** | **12** |

**INTRODUCTION**

The protocols and guidelines in this document are based on the expectation that all members of the traveling company have been fully vaccinated against COVID-19. "Fully vaccinated" shall mean the participant received an FDA authorized or approved vaccine or a WHO authorized or approved vaccine and the participant is more than 14 days following the final dose of a vaccine. The parties agree all eligible individuals should also be encouraged to receive all recommended COVID-19 boosters to remain up to date with their COVID-19 vaccinations.  Recommendations will be updated as often as necessary as more scientific knowledge about COVID-19, any variants to the virus and its transmission, and further vaccine information become available. The protocols and guidelines discussed are intended to provide an outline for health and safety for North American touring productions. If a production plans to travel outside of the United States of America, the parties' health and safety experts will discuss applicable regulations and other references they deem appropriate.

The proposed recommendations in this document are based on preventive strategies from the CDC, OSHA, State and local DOH, and medical and infectious diseases specialists, with the expectation that all members of the touring company have been fully vaccinated prior to first rehearsal.

The parties recognize that the changing landscape of COVID-19 and its variants may require modifications in the safety protocols based on government regulations and local epidemiology. Responsive actions might impact:
- Vaccination guidelines
- Masking
- Frequency and type of COVID-19 testing
- Other aspects of these protocols.

Any modifications will be shared as soon as possible and, where necessary, on an individual show or location basis.

**COMMUNICATION, TRAINING AND EDUCATION**
- All employees will be trained on COVID-19 prevention safety protocols so that they understand the policies and procedures related to reducing the risk of COVID-19 and their role in mitigating the risk to themselves and others.
- Time spent in mandated COVID Safety Training will count towards rehearsal hours.  Training time that is in excess of available rehearsal hours will be paid at the applicable rehearsal overtime rate.

**INDIVIDUAL RESPONSIBILITY FOR COVID-19 PREVENTION AND MITIGATION**

All employees will attest in a form attached to this document that they read, understood, and will abide by the protocols herein.
- All employees must adhere to all employer policies and procedures reasonably related to facilitate the execution of these protocols (i.e., adjustments to safety protocols based on local epidemiology and government regulations as detailed above.)
- All Equity members of the production must adhere to all venue policies and procedures reasonably related to facilitate COVID-19 safety of the venue worksite as they may be advised by the Employer and must take measures within their duties to promote a safe working environment.
- All employees must adhere to all COVID-19 mitigation laws, regulations or guidelines issued by federal, state, and local government authorities both at and away from the venue, as

communicated to the employee by the employer.
- These obligations apply both at and away from the venue.
- Actors and Stage Managers will not be assigned to be the designee for COVID-19 to ensure COVID-19-safety protocol compliance except as may be required in fulfilling their obligations herein.
- If an Actor or Stage Manager fails to adhere to these responsibilities, they may be subject to discipline. For the first and second offense it shall be a pay fine of $50.  For the third offense, and any subsequent offence in a twelve-month period, it shall be a pay fine of $50 and the loss of a Personal Day as defined in Rule 32(H) for each infraction.  After the fourth occurrence in a twelve-month period the Actor or Stage Manager may be subject to termination for any subsequent infraction.  Written notice shall be provided to the individual and to Actors' Equity.  Appeals under this provision shall be subject to the Issue Resolution process of this Agreement. All fines will be remitted by the Producer to the Actors' Fund and will be deducted from Actor's salary on a pre-tax basis.

## CDC COMMUNITY RISK LEVEL FRAMEWORK

The CDC's Community Risk Level Framework will be used to help communities decide what prevention steps to take based on the latest data.  The protocols below are based on this framework: https://www.cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.html.

For engagements in Canada, the New York Times Canada COVID-19 Hot Spot map shall be used in place of the CDC website for references to Community Risk Levels of Low/Green, Medium/Yellow and High/Red. https://www.nytimes.com/interactive/2021/world/canada-covid-cases.html

The Low, Medium, High categories shall be applied over as follows:

<u>Canada Map Color</u>    <u>Protocols Category</u>



Low (Green)

Medium (Yellow)

High (Red)

## MASKS

Individuals are not required to wear face masks per these protocols, except as recommended or required by the CDC, OSHA, state and/or local DOH or otherwise directed by the Employer.  Employees may continue to elect to wear a face mask except when doing so is incompatible or interferes with their job responsibilities or part of the performance during the tour such as performing on stage or other instances discussed in this document.
- Members of the touring company may elect to wear their own mask so long as such mask meets CDC recommendations and guidelines.
- Training on mask safety and disposable masks will be provided at no cost to the traveling company.
- In cases where a tour employs actors or stage managers who are d/Deaf or hard of hearing, the Employer will engage in an interactive process to determine what accommodations may be required, including whether and in what circumstances the face masks for other employees shall be the FDA approved transparent type.

- Face masks shall be encouraged on all company travel, local public transportation and in rideshares. When opting out of company travel, individuals will also be encouraged to remain masked.
- The COVID-19 Safety Manager will review and have the final determination if masks meet CDC safety standards and fit the individual touring company members properly.
- Masking, except when doing so is incompatible or interferes with their job responsibilities or part of the performance, shall be required in the following circumstances:
  - If the CDC's "COVID-19 Community Level" for the county is Yellow (Medium), face masks (KN95s, KF94s or surgical masks) shall be worn.
  - If the CDC's "COVID-19 Community Level" for the county is Red (High), KN95s or KF94s shall be worn.

**DISINFECTION AND MAINTENANCE**
- Enhanced cleaning as outlined in the CDC's recommendations for cleaning and disinfection if an individual is confirmed to have contracted COVID-19 and had a prolonged exposure (as defined by the CDC) to the workplace, and cleaning should continue to occur as described in the Production Contract Rule 62 and SET Contract Rule 56.
- All reasonable and practicable efforts will be made to disinfect props and surfaces daily, with alcohol-based sanitizer.
- If actors come in direct contact with soft props, such as sheets, towels, bar rags, etc., they should be laundered after use.
- When interacting with a Wardrobe representative, used tissue, lozenges, etc. must be discarded in trash receptacles rather than handing them to the wardrobe representative.
- Tools, brushes, applicators and equipment where possible will be dedicated to a single person. All reasonable and practicable efforts will be made to disinfect these items, during and after a performance, with alcohol-based sanitizer.

**HEATING, VENTILATION AND AIR-CONDITIONING SYSTEMS**
Venues will practice continuous assessment by qualified facilities personnel and, if necessary, outside contractors, of circulation-related building systems (e.g., ensuring HVAC systems use MERV-13 filters or better, and venues will provide supplemental, portable HEPA air cleaners in spaces with poor ventilation or limited fresh air ability, such as the Orchestra Pit or unvented dressing rooms, with a goal of increasing outdoor air ventilation as much as possible, in part by keeping systems running longer hours where possible). Assessments will include, but may not be limited to cleaning, repairing, replacing, and/or upgrading system components as necessary and, to the extent reasonable, as called for by best practices, CDC, OSHA, and State/Local DOH guidance. Employers will work with Presenters to provide HVAC system information to Equity upon request.

**AUDIENCE RELATED**
- Autograph signings, meet-and-greets and backstage tours are prohibited when the Community Risk Level is Yellow (Medium) or Red (High).
- Talkbacks may happen if the production participants remain onstage and the attending audience members remain in the house.
- When the audience is seated as to be immersed with the production design and/or the actors are staged to be interactive with the audience, then the production shall have a show-specific discussion with Equity to review if additional measures for actors' safety are appropriate in counties where the CDC Community Risk Level is Yellow or Red.

- The COVID-19 Safety Manager(s) shall review and approve the safety protocols of press events and remain available to members of the company before and during the events.

## ESSENTIAL VISITORS

- Essential visitors are persons working directly with the production (including local Physical Therapists).  Essential Visitors must be fully vaccinated, as defined above, prior to interaction with the company.
- Essential visitors shall provide negative test results with the same requirements as the company, or if it not tested on the same basis as the company, then provide a negative FDA authorized or approved PCR or Molecular test taken within 72 hours or antigen test taken within 24 hours prior to their backstage visit when the Community Risk Level is Yellow (Medium) or Red (High).
- Invited run throughs shall be permitted in the rehearsal studio provided that all invited individuals adhere to the protocols for visitors and the occupancy for the space is consistent with the occupancy requirement of federal, state and local authorities.

## OVERSIGHT AND LEADERSHIP/COVID-19 SAFETY MANAGER

A COVID-19 Safety Manager with training in infection prevention and occupational health screening and surveillance will have the responsibility and authority for COVID- 19 safety compliance and enforcement and will be employed in each touring company The COVID-19 Safety Manager(s), in consultation with the production's medical expert, the League's medical expert and production management, has decision-making authority concerning COVID-19 related safety practices. The COVID-19 Safety Manager(s) shall be readily accessible to all crew, employees, stage managers and cast members of the tour.

The COVID-19 Safety Manager(s)' primary duties and responsibilities may include but are not limited to, overseeing, monitoring and enforcing adherence to protocols for testing, symptom monitoring, cleaning and disinfection, PPE, liaising with the local venue and ensuring that orientations and training occur, and other COVID-19 related duties as determined by the Producer.  The COVID-19 Safety Manager(s) may be assigned additional duties within the traveling company but will not be stage managers or actors in the production's Equity company. Issues under this provision shall promptly be raised to management and may submitted to the Issue Resolution process for resolution.

## REQUIRED MEETINGS
In the first and third week of a new production, a brief meeting is to be held as follows:

- To discuss any protocols observed that were not properly followed and determine remedies
- To announce safety updates as available
- In the case of COVID-19 positive individuals, provide updates to the meeting group only, while ensuring the individual's privacy
- To allow for group members to share feedback or announcements of their own related to safety protocols re: upcoming activities, etc.
- Participants in this meeting will include:
  - The Employer's COVID-19 Safety Manager
  - General Management and/or Company Management
  - Director, Choreographer and/or Director/Choreographer will be invited to join but attendance will not be required.
  - An Equity staff person will attend as often as possible.

- o   Production Stage Manager will be invited to join but attendance will not be required.
- After this time, Equity can request such meeting, which will be arranged within the week of request.

**TESTING**

- The Employer shall provide, at no cost to the Actors and Stage Managers (including no upfront/out of pocket costs), FDA authorized or approved PCR, Molecular or Antigen tests, with minimum frequency determined by the CDC COVID-19 Community Risk Level.
- After the first day of in-person work, FDA authorized or approved PCR, Molecular or antigen tests should be administered o less than the minimum per the engagement's CDC Risk Levels as follows:
    - o   Red (High): No less than two (2) times per week
    - o   Yellow (Medium): No less than one (1) times per week
    - o   Green (Low): testing required only when the employee is exposed to COVID-19 (as defined by the CDC) in the workplace or has symptoms of COVID-19.
    - o   If the tour travels in the week, the first test in the week for shall be within 72 hours of the after the company travel date. This provision does not alter the minimum testing requirement above, and shall apply only to the first travel jump in the week if more than one is scheduled.
- If an individual tests positive with an Antigen test, then, consistent with SYMPTOM MONITORING, below, that result will be confirmed with a follow-up FDA authorized or approved PCR or molecular test.
- Testing time shall be counted as follows:
    - o   Testing connected to a call: Equity members may be called up to 30 minutes early to a rehearsal and/or performance call to accommodate for required COVID-19 testing without additional payments or time calculated towards rehearsal hours based on the minimum testing frequency determined by the CDC Risk Level above or as otherwise required by these protocols. Such testing may occur at the venue, at the company hotel(s) if members have chosen that housing, or an offsite facility within a reasonable distance from the venue.
    - o   Additional testing, beyond the requirements above, either earlier testing in the day, or testing at a facility further from the venue than provided for above, shall be counted towards rehearsal hours in fifteen-minute increments based on time spent at the testing location.
    - o   At-home testing: Should the Employer provide at-home test kits, such time will not be counted into rehearsal hours so long as the deadline for submitting proof of tests is no sooner than 12 hours from the end of the prior call, except for days with matinee performances, in which case the deadline for submitting proof is no sooner than 10 hours from the end of the prior call, or if earlier in the day, within thirty minutes before the travel call.
        - Should the employer require an earlier deadline, such time shall be counted as 15 minutes per test of rehearsal time.
        - Individuals shall write their name and the date on the test for submission to the employer.
    - o   If additional testing or at-home testing triggers 15-minute rehearsal increments to be used, then during those weeks rehearsals shall be permitted to be prorated in 15-minute increments correspondingly for the affected employees.

- An individual who returns to work following a confirmed positive COVID-19 diagnosis (consistent with the return-to-work language in the section "Symptom Monitoring" below), the individual will not require routine COVID-19 testing for a period of 90 days following their initial diagnosis unless they have developed symptoms for COVID-19, distinct from their usual state of health, in which case an FDA authorized or approved antigen test shall be used.  Thereafter they shall resume testing on the same frequency as the rest of the company.
- Reporting of test results to employers will be done in a confidential manner consistent with state, city and federal regulations. Notification of exposed co-workers shall occur in a way as to protect the confidentiality of the person with COVID-19 and in accordance with statutory confidentiality requirements. Should there be a confirmed positive test result, the Union will be informed as soon as practicable, in no event later than 24 hours, and in a manner consistent with legal confidentially requirements.
  - o The following information will be reported to the union:
    - If it is an Equity member, or role in the production if not an actor or stage manager
    - Whether this individual is masked or unmasked in the workplace
    - Last day worked
    - Date of confirming positive test
    - Date expected to return
- If within five (5) consecutive days, there are five (5) confirmed new COVID-19 positive cases within the regular full-time company (Equity company, crew and musicians), then for a period of fourteen (14) calendar days starting with the day of the fifth confirmed COVID-19 case the employer will: move to testing on each workday (with either an antigen, Molecular or PCR test) and require KN95 or KF94 masks at all times, except when doing except when doing so is incompatible or interferes with their job responsibilities or part of the performance.  If Equity, the League, or the Production believe that additional steps may be appropriate, the parties agree to discuss within 24 hours of request.

## SYMPTOM MONITORING AND PROTOCOLS FOLLOWING A POSITIVE TEST

- Anyone who develops symptoms consistent with COVID-19 as defined by the CDC must self-report to the employer's COVID-19 Safety Manager, test for COVID-19 and isolate pending the results of a COVID-19 test.
- If a <u>symptomatic</u> individual tests <u>negative</u> for COVID-19, then the individual may return to the workplace if they are well enough to do so and do not have any symptoms indicative of another infectious disease:
  - o If the initial test is an antigen test, then they shall take a PCR or Molecular test. If the PCR or Molecular test is negative, the individual may return to the workplace.
  - o If the initial test is a Molecular or PCR test, then the individual may return to the workplace per these protocols.
  - o For Rules governing illness and sick leave in circumstances other than COVID-19 see Production Contract Rule 33 or SET Agreement Rule 30, as applicable.
- If an <u>asymptomatic</u> individual tests <u>positive</u>:
  - o If the initial test is an antigen test, then they shall take a PCR or Molecular test. If the PCR or Molecular test is negative, the individual may return to the workplace.
  - o If the initial test is a PCR or Molecular test, the initial result shall be deemed to be a positive for the purpose of these Protocols.
- PCR and Molecular tests shall be considered valid and conclusory unless there is a reasonable

basis to believe there was an error in the administration or processing of the test.  In which case, a supplemental lab-based PCR test may be administered.

- All individuals who are confirmed to have tested positive for COVID-19 shall isolate consistent with applicable CDC guidance (current guidance noted below) and are recommended to receive an evaluation from a licensed health care provider.
- The employer will provide COVID-19 testing as soon as possible to all individuals in the production who have been in close contact with the individual that contracted COVID-19 regardless of Community Risk Level or vaccination status.
- Should an employee or contractor that closely and regularly interacts with the production develop a symptom-profile consistent with COVID-19 or test positive for COVID-19, and those individuals had a prolonged exposure (as defined by the CDC) to the workplace, enhanced cleaning shall be performed as outlined in the CDC's recommendations for cleaning and disinfection.
- CDC, OSHA, Federal, state and local public health departments' requirements and guidelines for COVID-19 exposures will be followed.
- A person may return to work consistent with up-to-date public health guidance, including using the CDC's symptoms-based strategy if symptomatic and time-based strategy if asymptomatic. The parties will update return to work protocols consistent with updates to the CDC guidance. As of October 12, 2022, the return-to-work guidelines as confirmed by the parties are:
    - A person must isolate, irrespective of whether they are symptomatic, if they contract COVID-19.  The period of isolation is calculated as follows:
        - Day 0 is the first day of symptoms
        - If no symptoms, Day 0 is the date of the initial positive test. If symptoms develop after the positive test the clock resets and Day 0 is the first day of symptoms
        - Day 1 is the first full day following Day 0
    - A person may leave isolation after Day 5 and resume activity (no sooner than Day 6) if:
        1. The employee can wear a mask at all times:
            a. Their COVID-19 symptoms are improving (based on the CDC COVID-19 symptoms list) and they have been fever-free without the usage of fever reducing medications; AND
            b. They test negative on an antigen test taken on or after Day 5. A negative antigen test is required if returning to work before Day 10; AND
            c. For the subsequent remainder of the 10-day period following Day 0 they must, at all times, be able to wear a well-fitting KN95 or KF94 mask.
        2. If the employee cannot wear a mask in performing their job duties:
            a. Their COVID-19 symptoms are improving (based on the CDC COVID-19 symptoms list) and they have been fever-free without the usage of fever reducing medications; AND
            b. They test negative on antigen tests administered on Day 6 and Day 8, then the employee can return as of Day 9.
        - If a person does not meet the criteria above, they must continue to isolate through Day 10. After Day 10, the person may return to work only if they are symptom-free (based on the CDC COVID-19 symptoms list).

**LOCAL PERSONNEL**

- To the extent possible, all local crew and all local musicians that are engaged to run the performance that interact regularly and directly with the touring company will be fully vaccinated as defined above prior to start of the engagement. Where not possible, see UNVACCINATED PERSONNEL section below.
- COVID-19 testing of the local crew and local musicians, that interact directly with the touring company will be consistent with the testing required for the touring company.

**SICK LEAVE**

For the period that commences June 25, 2022, Actors and Stage Managers who contract COVID-19 and are required to isolate in accordance with these Protocols, shall receive sick pay for the number of performances required to be missed in compliance in these Protocols (up to a total of twelve (12) performances) or as may be required by applicable law, if greater.  Sick pay under this provision is to be paid at contractual salary, up to the amounts listed below for the first five (5) days of performances missed and at the applicable minimum salary thereafter. Actors and Stage Managers shall be entitled to sick pay for subsequent occurrences in accordance with applicable law subject to the provisions of this paragraph.  Sick pay under these protocols shall not be banked or carried over for any other purpose and employees shall return to work consistent with the return-to-work provisions in the SYMPTOM MONITORING section of this document.

- Production Tours: $4,000
- Tiered Tours: $3083
- SETA Tours: $2327

**VACCINATION**

Subject to the exceptions set forth below, and except as prohibited by applicable law, the Employer will require all members of the traveling company employed by the Employer to be "fully vaccinated," in accordance with the definition above.  As noted previously, it is strongly recommended that employees also receive recommended booster vaccines and remain up to date with their COVID-19 vaccinations.

Members of the traveling company must provide the Employer with proof of vaccination at a date established by the Employer, but in no event later than the first day of rehearsal.

Members of the traveling company who cannot receive a COVID-19 vaccination because of a qualifying disability or a sincerely held religious belief must contact the Employer at a date established by the Employer to request an accommodation.  The Employer will decide whether to provide a reasonable accommodation in accordance with applicable law.

The League and Equity will determine the appropriate Health & Safety protocols for venues where local law, regulations or guidelines do not allow for mandated vaccinations.

**UNVACCINATED PERSONNEL IN THE WORKPLACE**

Unvaccinated personnel in the workplace include juveniles currently ineligible to receive an FDA or WHO authorized or approved vaccine, or individuals that receive reasonable accommodation as detailed in the VACCINATION section above. Unvaccinated individuals will be required to adhere to all sections of this document.

**ISSUE RESOLUTION**

As a mechanism for resolving concerns about application of prevention efforts contained in these Protocols, the following process shall apply:

Any alleged non-compliance with the safety protocols must be promptly addressed. Notice must be provided to Management, Equity, and the Broadway League to ensure all parties are informed. The actors and stage managers must continue to be paid during the entire Issue Resolution process but no longer than their individual contract. Management will be permitted the rest of the business day and the next business day to resolve the issue (if it cannot be resolved in such time, a request to Equity to extend the period will be sought and which approval will not be unreasonably denied).

If Management and Union disagree about whether there is a compliance issue, the following process will be employed:

The Parties health and safety experts ("The HSE") shall meet and confer within 24 hours and attempt to reach a resolution.   The HSE will be required to render either a joint, agreed upon written opinion, or separate, individual written opinions.  The HSE shall set forth the basis for their opinion in reasonable detail.  The HSE shall not refuse to render an opinion or refer the issue(s) back to the union and the League.

In the event the HSE's do not agree within a 24 hour period, the issue will be presented to and resolved by the "Health & Safety Arbitrator" ("H&S Arbitrator") within 24 hours after the HSE's issue their opinions.

The parties will jointly select a panel of third-party neutrals who will be designated to hear and determine disputes under this Agreement as the H&S Arbitrator (a list to be attached to this Agreement).  An H&S Arbitrator shall be a qualified individual in epidemiology, infectious disease, or industrial hygiene and able to render judgment on the health and safety compliance matters herein.

For each dispute, one panelist will be jointly selected by the parties to serve as the H&S Arbitrator. If the parties cannot agree on a H&S Arbitrator from the panel, the neutral will be selected based on a rotational basis.

The H&S Arbitrator must resolve the issue(s) only by accepting one of the two HSE opinions rendered. The H&S Arbitrator is not authorized to craft resolutions and remedies different from those contained in the HSE opinion adopted.

**TERM OF THIS AGREEMENT**

This agreement will expire, and the terms will not continue as of January 22, 2023, provided that the parties will meet no later than December 19, 2022 to review the science and discuss whether and to what extent, if any, the agreement should be extended based on the state of the virus and the risk to the members at that time.

**ACKNOWLEDGEMENT**

I hereby acknowledge that I have read and agree to abide by Actors' Equity Association and The Broadway League's Touring Safety Protocols dated October 12, 2022 for the tour of

1776
_____

　　INSERT SHOW NAME


ACTOR'S / STAGE MANAGER'S NAME, Actor / Stage Manager

Zuri Washington
_____

Actor's / Stage Manager's AEA ID

165467
_____

Date:　12/10/2022
　　　　_____


To be executed in quadruplicate and attached to each copy of each contract entered into between Actor or Stage Manager and Producer.