**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ZURI WASHINGTON,<br>*Plaintiff*<br>v.<br>NETWORKS PRESENTATIONS LLC, *et al.*,<br>*Defendants* | No. 25-cv-3815-ABA |

**MEMORANDUM OPINION**

Plaintiff Zuri Washington alleges that she was discriminated against on the basis of her race and retaliated against for engaging in protected activities by Defendants NETworks Presentations, LLC ("NETworks"), 1776 Touring, LLC ("1776 Touring"), National Artists Management Company, Inc. ("NAMCO"), and Gentry & Associates, Inc. ("Gentry") (together "Defendants") in connection with her employment as a cast member in a traveling musical production. Defendants have filed a motion to dismiss Ms. Washington's second amended complaint. For the reasons that follow, the Court will grant the motion in part and deny it in part in that all claims will be dismissed except for Ms. Washington's Title VII and Section 1981 retaliation claims.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

In 2022, NETworks, a Broadway show producer, and NAMCO, an entertainment production company, "teamed up to produce an innovative new production of *1776*" (the "Show"), a "classic musical [that] premiered on Broadway in 1969 and tells the story of

[1] At the pleadings stage, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

America's founding." ECF No. 54 ¶¶ 1–2. The Show was innovative because it "exclusively starred multi-racial actors who identify as female, nonbinary, and/or transgender—groups that were historically shut out and never considered during the drafting of the Declaration of Independence—as opposed to a cast of white men." *Id.* "NAMCO contracted with NETworks to produce the Show. NETworks, in turn, contracted with Gentry to manage the Show's crew and cast. NETworks also established 1776 Touring, LLC as a 'pass-through' LLC that entered into employment contracts with cast members and paid wages." *Id.* ¶¶ 70–71. On December 3, 2022, Ms. Washington, who is Black, was cast to play Robert Livingston in the Show. *Id.* ¶¶ 6–7, 69, 73. On March 24, 2026, while touring with the Show, Ms. Washington was fired. *Id.* ¶ 177. Ms. Washington contends that Defendants discriminated and retaliated against her in connection with her firing and various other instances that are described below.

### A. Allegations Regarding Ms. Washington's Hair Plan

"[A]s soon as she learned that she had been cast in the Show, Ms. Washington sought to align with the producers of *1776* regarding the plan for her hair, knowing that she would be unable to wear her natural hair while performing." *Id.* ¶ 9; *see id.* ¶¶ 88, 90. "[O]n December 14, 2022, the Associate Hair Designer, Ashley Wise, held hair consultations in Manhattan, New York with the cast during which they each were asked specifically whether they preferred to wear a wig, and if not, what look best suited their personal styles." *Id.* ¶ 93. At that time, Ms. Washington told Ms. Wise "that she preferred wearing either a wig or a braid installation and was not comfortable with using her natural hair for her performance." *Id.* ¶ 95. Ms. Washington expressed "concerns related to the hair she would be wearing while performing early in the process so that the relevant conversations could be had, and decisions could be made, well before

heading out on the road." *Id.* ¶ 96. But she contends she was not provided any additional information about her hair plan in December 2022 or after she asked again about it twice in January 2023. *Id.* ¶¶ 97–100. Around January 14, 2023, "Ms. Washington . . . was told to wear a protective style but still not told whether she would be wearing a wig for the Show." *Id.* ¶ 102.[2] "Ms. Washington grew concerned about the lack of specific information" on her hair plan, and on February 1, 2023, "again reached out to [stage manager Geneveive] Kersh for an update on her hair plan" at which time she was told by Ms. Wise "that her hair should specifically be a two-strand 'spring' twist." *Id.* ¶¶ 105–06. Ms. Washington sought clarification about the hairstyle and who would be responsible for styling it, but did not receive a response. *Id.* ¶¶ 107–110. Ms. Washington alleges that "[n]one of the Show's white actors were uninformed about such an important issue having to do with their appearance during performances." *Id.* ¶ 111. On February 2, 2023, Ms. Washington again sought clarification and Ms. Wise "emailed Ms. Washington an image for the specific protective hairstyle the production team wanted for Ms. Washington," and was told soon thereafter "that the Show would be covering the cost of implementing the hair style and maintaining it throughout the tour, that she would not need to cut her hair, and that the Show would find someone to do the styling professionally and have it maintained over the course of the tour." *Id.* ¶¶ 112, 115, 117. Ms. Washington alleges that she was also told that her request for a wig had been denied, *id.* ¶ 119, though elsewhere in her complaint she contends that she told Ms. Wise "that she preferred wearing *either* a wig *or* a braid installation," *id.* ¶ 95 (emphasis

[2] As the parties explain in their briefs, a braid installation was one protective style that Ms. Washington had preferred. *See* ECF No. 89 at 13; ECF No. 92 at 23.

added). Ms. Washington alleges that some white actors were provided with wigs. *Id.* ¶ 120.

Around the same time and while touring, there was one occasion where Ms. Washington was unable to book a hair styling appointment and thus the assistant choreographer styled her hair. *Id.* ¶¶ 121, 123. This process took many hours and "Ms. Washington had to balance attending tech rehearsals with getting her hair completed," resulting in her "not [being] ready when rehearsals began and [she] had to rush to the stage, which upset stage managers who did not understand why she had not been ready." *Id.* ¶¶ 124–125. Ms. Washington had to continue having her hair worked on "during a meal break" and it was not completed until "3:00 A.M. that night, with another full day of tech rehearsal set to start in just a few hours." *Id.* ¶ 126. After that experience, she told others that she was frustrated and exhausted because of the production team's "last-minute, botched hair plan." *Id.* ¶ 127.

The next day, February 11, 2023, Ms. Kersh remarked to Ms. Washington "that some people in the company had stated that Ms. Washington had been 'short' with them." *Id.* ¶ 128. Ms. Washington believed that the use of the term "short" in that situation "felt like casual racism." *Id.* ¶ 132.

During a meeting with management on February 15, 2023, "Ms. Washington explained why she believed her treatment on the Show up until that point and certain microaggressions she experienced were racially tinged/racist," including regarding the use of the word "short" and the lack of information about, and delay in implementing, her hair plan. *Id.* ¶¶ 130–34.

### B. Allegations Regarding the COVID-19 Meeting

Separately from her concerns about her hair, Ms. Washington also was dissatisfied with how the production team handled COVID-related protocols. While the show was touring in mid-February 2023, there was "a positive case of COVID-19 in the workplace." *Id.* ¶ 136. On February 17, 2023, "the cast, production team, and managers met to discuss COVID-19 safety measures for the Show." *Id.* ¶ 138. During that meeting "numerous individuals expressed frustration and dismay," and "became animated." *Id.* ¶¶ 141–42. Ms. Washington describes her own reaction in her complaint:

> Ms. Washington slapped her hand against the back of the chair in front of her for emphasis and vocalized her frustration by saying to the production team: "You keep talking about our how you're following Equity's [the actors' union] rules. I don't give a f*ck about Equity. I've said it before, and I'll say it again – your testing standards should be more stringent. We [the cast] are the ones on the road and we are the ones who can't mask all the time."

*Id.* ¶ 143.

Following that meeting, General Manager Madeline McCluskey called Ms. Washington's agent "to report her as allegedly being 'unruly' and 'slamming chairs' during the COVID-19 Meeting." *Id.* ¶ 144. Ms. Washington's agent told Ms. Washington what Ms. McCluskey said. Ms. Washington's reaction was to express that she "was infuriated by being stereotyped as the 'angry Black woman' on the cast." *Id.* ¶ 145. Ms. Washington alleges "that she was the only cast member whose agent was called even though many members were impassioned in the meeting." *Id.* ¶ 146.

### C. Ms. Washington is Fired

A few weeks after that meeting, on March 21, 2023, Ms. Washington met with "Sarah Rajtik, a third-party Human Resources professional" and a union representative

regarding the events described above and her belief that she had been discriminated against. *Id.* ¶¶ 156–66. "After Ms. Washington finished detailing her experiences in this meeting, Ms. Rajtik stated that she needed to conduct other interviews and would get back to Ms. Washington and her union representative with her findings." *Id.* ¶ 168. On March 24, 2023, Ms. Rajtik "informed Ms. Washington that, according to the Show's producers, the reason that only her agent was called in relation to the COVID-19 Meeting was because Ms. Washington was 'cursing' and no one else was." *Id.* ¶ 169.

After Ms. Rajtik told Ms. Washington that her managers were not planning to apologize, Ms. Washington made "a gesture with her middle finger." *Id.* ¶¶ 172–73. "Ms. Rajtik then told Ms. Washington that there was nothing further she could do but offered Ms. Washington the option of filing an official complaint of discrimination," to which Ms. Washington responded as follows: "You know what, yes, I will, because this is the only course of action available to me and I'm going to do it. I'll take these f*ckers down that way if I have to. I've taken bigger f*ckers down before and I'll do it again. So yes, I will be filing an official complaint with HR." *Id.* ¶¶ 174–75. "Ms. Rajtik responded: 'Ok. Write up your account and send it to me at your earliest convenience,' which Ms. Washington agreed to do." *Id.* ¶ 176.

"[W]ithin just a couple of hours" of that conversation, "Ms. Washington received a sudden phone call from her agent who notified her that her employment and contract was being abruptly terminated." *Id.* ¶ 177. The next day, March 25, 2023, Ms. Washington received a letter terminating her contract for "aggressive, uncontrolled behavior and threatening statements, including, but not limited to, 'I will take these f*ckers down; I have taken bigger f*ckers down' on . . . Friday March 24th, 2023," which the letter stated would "not be tolerated and require[d] immediate termination." *Id.* ¶

178. Ms. Washington's managers later told her "union representatives that she had to be removed from the workplace due to being an 'immediate safety concern' based specifically on what was said during the March 24, 2023, meeting with HR." *Id.* ¶ 184.

### D. Procedural History

Ms. Washington initially filed her lawsuit based on the events recounted above in the Southern District of New York. ECF No. 1. After Defendants filed motions to dismiss, she filed a first amended complaint. ECF No. 51. The court nonetheless granted the Defendants' motion to dismiss for, among other things, improper venue because a "substantial part" of the alleged events did not occur in New York. ECF No. 52 at 17–18. But the court did grant Ms. Washington leave to file a second amended complaint. *Id.* at 20. Ms. Washington filed a second amended complaint on May 1, 2025. ECF No. 54. Ultimately, however, the court again found venue lacking and transferred the case to this Court because, other than NAMCO, the Defendants have their principal places of business in Maryland and Maryland was "the location where Defendants decided to terminate Plaintiff." ECF No. 68 at 2.

The second amended complaint contains eight counts against Defendants including Counts 1, 3, 5, and 7 for racial discrimination in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 296, *et seq.* (the "NYSHRL"), and the New York City Human Rights Law, New York City, N.Y., Code § 8-101, *et seq.* (the "NYCHRL"), and Counts 2, 4, 6, and 8 for retaliation under those same statutes. ECF No. 54 ¶¶ 191–225. Defendants have moved to dismiss the second amended complaint. ECF No. 88. Ms. Washington filed a response and Defendants filed a reply. ECF Nos. 92 & 95.

## II. STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and state a facially plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As stated, when considering such a motion, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III. DISCUSSION

Ms. Washington has asserted claims of discrimination and retaliation in violation of Title VII, Section 1981, the NYSHRL, and the NYCHRL. Defendants have moved to dismiss all of the claims and contend additionally that NAMCO should be dismissed because it was not Ms. Washington's employer. The Court will first discuss the Title VII and Section 1981 discrimination claims and then the Title VII and Section 1981

retaliation claims. The Court will thereafter address the two state law claims and the allegations regarding NAMCO.

### A. Title VII and Section 1981 Discrimination

"[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination" to survive a motion to dismiss claims brought under burden shifting statutes such as Title VII and Section 1981. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) (concerning Title VII claims); *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (applying *Swierkiewicz* to Section 1981 claims). Instead, a plaintiff is "'required to allege facts to satisfy the elements of a cause of action created by [the relevant] statute' in compliance with *Iqbal*." *Woods*, 855 F.3d at 648 (quoting *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015), a case under Title VII). But a complaint must still "'state[ ] a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense'" and include sufficient factual allegations "to raise a right to relief above the speculative level." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting first *Iqbal*, 556 U.S. at 679, and then *Twombly*, 550 U.S. at 555)), *aff'd* 566 U.S. 30 (2012).

The parties assert that Ms. Washington's Title VII and Section 1981 claims can be considered under the same pleading standard. *See* ECF No. 89 at 29 (Defendants asserting that "[t]he same framework is used to evaluate claims arising under Title VII and § 1981")[3]; ECF No. 92 at 27–28 (Ms. Washington stating that "courts otherwise analyze Title VII and Section 1981 race-discrimination under the same general

[3] Page citations correspond with ECF pagination, which may differ from the parties' page numbers.

framework”). The Court agrees that for the purposes of this motion, it is appropriate to consider the Title VII and § 1981 claims together. *See Sillah v. Burwell*, 244 F. Supp. 3d 499, 511 (D. Md. 2017) (“In the employment context, courts analyze claims of racial discrimination brought under § 1981 consistent with those brought under Title VII.”).[4]

Title VII prohibits an employer from “discharg[ing] any individual, or otherwise discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual’s race.” 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that “[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens,” and, among other things, prohibits racial discrimination in connection with employment contracts. 42 U.S.C. § 1981. To adequately plead such claims, Ms. Washington must allege “that the employer took an adverse [employment] action against [her] ‘under circumstances which give rise to an inference of unlawful discrimination.’” *Hammoud v. Jimmy’s Seafood, Inc.*, 618 F. Supp. 3d 219, 234–35 (D. Md. 2022) (quoting *Tex. Dep’t of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see Hayes v. Wall Recycling, LLC*, 729 F. Supp. 3d 553, 559 (E.D.N.C. 2024) (“In order to state a race discrimination claim under Title VII or section 1981, Hayes must plausibly allege that Wall discharged him because of his race.”) (citing 42 U.S.C. §§ 1981, 2000e-2(a)(1) and *McCleary-Evans*, 780 F.3d at 585).

---

[4] That is not to say that there are not important differences between the statutes. One difference that is not immediately relevant is that under Title VII, a plaintiff must prove that racial discrimination was a motivating factor for the adverse employment action whereas under Section 1981 a plaintiff must prove that “but for” racial discrimination, the plaintiff would not have been subjected to the adverse employment action. *Comcast Corp. v. Nat’l Ass’n of Afr. Am.-Owned Media*, 589 U.S. 327, 336–37, 341 (2020).

To adequately plead a requisite adverse employment action, Ms. Washington "must show some harm" arising from an employer's action "respecting an identifiable term or condition of employment," although that harm need not be "significant." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 354–55 (2024). Ms. Washington alleges only one employment action that is adequately adverse to maintain a discrimination claim: her firing. She has failed to allege that the other challenged actions had any effect on the terms and conditions of her employment, including (1) the confusion and lack of clarity regarding her hair plan, (2) the failure to provide her with one of the hair options she preferred (a wig), (3) the one instance where she had to "balance attending tech rehearsals with getting her hair completed" that resulted in "not [being] ready when rehearsals began and [she] had to rush to the stage," ECF No. 54 ¶¶ 124–125, (4) being told once that others had said she had been "short" with them, and (5) having her agent called after the COVID-19 meeting. She has not alleged, for example, that these instances affected her pay, position, duties, or opportunities or inhibited her performance. Ms. Washington has alleged that these instances caused her frustration, embarrassment, and anger, but she has not adequately alleged that they caused any detriment with respect to a specific term or condition of her employment. These complaints amount to "an employee's dissatisfaction with this or that aspect of work" which "does not mean an employer has committed an actionable adverse action." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004).

While there is no dispute that being fired is an actionable adverse employment action, Ms. Washington has not adequately alleged facts that raise a plausible inference of discrimination in connection with her firing. *Coleman*, 626 F.3d at 190. She has not alleged, for example, that individuals who are not Black were treated differently than

she was in a similar situation or that she was replaced by a non-Black actor. At best she argues that "Defendants' description of Plaintiff's purported behavior in her meeting with HR in the Termination Notice as 'aggressive,' 'uncontrolled,' and 'threatening' *may* also invoke the 'angry Black woman' stereotype and suggest racially discriminatory animus." ECF No. 92 at 27 (emphasis added). But the circumstances as alleged, taken as a whole, do not support a plausible inference that Ms. Washington's employment was terminated because of her race—particularly based on the facts she alleges in connection with her retaliation claim (which does state a plausible claim as discussed below), in combination with the fact that Ms. Washington herself alleges that she threatened to file a complaint in order to "take these f*ckers down," and "enthusiastically" used vulgar language and gestures in "express[ing] her intent to file formal race discrimination complaints." *Id.* ¶¶ 173, 175, 186.

Ms. Washington's arguments support this assessment. In her response brief she argues that "Plaintiff is a Black woman who indicated her intent to file a formal race discrimination complaint against the producers of the Show and was fired within a few hours. Such a sequence of events occurring in close temporal proximity can undoubtedly create an inference of discrimination." ECF No. 92 at 27. And in the second amended complaint she alleges that Defendants "all but admitted that the Show had fired Ms. Washington because of her intent to file a race discrimination complaint," ECF No. 54 ¶ 179, and that "had Ms. Washington not enthusiastically expressed her intent to file formal race discrimination complaints against the Show and its producers based on their racially discriminatory conduct that began in New York City and continued at each stop on the tour, Defendants would not have terminated her employment," *id.* ¶ 186.

These arguments and allegations go to retaliation for filing a discrimination complaint, rather than supporting the alleged discrimination itself.

Because Ms. Washington has not adequately pled facts that create a plausible inference that Defendants took discriminatory adverse employment actions against her because of her race, Counts 1 and 3 will be dismissed without prejudice.

**B. Title VII and Section 1981 Retaliation**

Ms. Washington has also alleged that she was fired in retaliation for threatening to file a discrimination complaint in violation of Title VII and Section 1981. Title VII prohibits an employer from "discriminat[ing] against any [employee] because he [or she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). And the Supreme Court has held "that § 1981 encompasses retaliation claims." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008). To plead a retaliation claim, the complaint must "allege[ ] facts supporting a plausible inference that [the plaintiff] was terminated 'because' of his [or her] protected activity." *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022). Thus, Ms. Washington must allege that "but for" threatening to file a discrimination complaint, she would not have been fired. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)."); *Ali v. BC Architects Eng'rs, PLC,* 832 F. App'x 167, 172–73 (4th Cir. 2020) ("And in line with other § 1981 claims, to state a § 1981 retaliation claim, a plaintiff must allege facts rendering it plausible that, but for her participation in protected activity, she would not have suffered a materially adverse action.").

Defendants argue that the "but for" cause of Ms. Washington's firing was her offensive and threatening behavior, not the fact that the threat related to filing a discrimination complaint. But the statement that Defendants describe as "threatening" and as the "but for" cause of the firing *was a threat to file a discrimination complaint* in order to "take these f*ckers down." ECF No. 54 ¶ 178. Drawing all reasonable inferences in favor of Ms. Washington, she has plausibly alleged that she would not have been fired but for her threat to file a discrimination complaint regardless of whether she used offensive language and gestures.

Defendants cite cases for the proposition that where there is an obvious "more likely explanation" for an adverse action, it is not plausible that the action was taken for retaliatory reasons; here they argue that it is more likely that Ms. Washington was fired for using obscenities and being threatening than the fact that the threat was to file a discrimination complaint. *See, e.g. Seabrook v. Driscoll*, 148 F.4th 264, 274 (4th Cir. 2025) ("The 'more likely explanation' for Seabrook's poor review is the Army's finding that her negative leadership created a toxic work environment."). The difference here is that the use of obscenities and the threat to file a complaint are part of the *same* occurrence rather than two separate possible causes, and the real reason for her firing cannot be determined based on the allegations alone. And unlike in *Faulkenberry v. Austin*, where the threats at issue, coming from a "decorated Army Special Forces combat veteran," could be perceived as including threats of violence, Ms. Washington's threat was clearly to file a complaint. Case No. 22-cv-01150-JMC, 2024 WL 449297, at *1, *9 (D. Md. Feb. 6, 2024) ("Plaintiff has insufficiently pled that the administrative leave was because of the purported protected activity rather than Plaintiff's perceived threats of violence. . . . This conclusion is buttressed by the context surrounding the

statements, namely that Plaintiff is a decorated Army Special Forces veteran with combat experience."), *opinion clarified*, Case No. 22-cv-01150-JMC, 2024 WL 4838827 (D. Md. Nov. 20, 2024).

Moreover, the very close temporal proximity between Ms. Washington's threat to file a complaint and her firing— "just a couple hours," *see* ECF No. 54 ¶ 177—also militates against granting the motion to dismiss these claims. *See Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873, 880 (D. Md. 2012) ("[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action suffices to establish a prima facie case of causation where the temporal proximity is 'very close.'") (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

For these reasons, Defendants' motion to dismiss Ms. Washington's Title VII and Section 1981 retaliation claims will be denied.

### C. The State Law Discrimination and Retaliation Claims

Ms. Washington has also raised discrimination and retaliation claims under New York City's and State's anti-discrimination statues, the NYCHRL and the NYSHRL. As stated, this case originated in the Southern District of New York but was transferred to this Court after the court there concluded that venue was improper in New York. When Ms. Washington was fired, she, and the show, were no longer in the state of New York. *See* ECF No. 52 at 4, 18 (S.D.N.Y. court explaining that Ms. Washington was in Denver when she was fired and that "a substantial portion" of her allegations had not occurred in New York); ECF No. 54 ¶ 187 (alleging that "[f]ollowing her termination, Defendants made arrangements to fly Ms. Washington and ship her belongings back to New York City").

But "[t]o state a claim under the NYCHRL, the Plaintiff must allege that the Defendant discriminated against her 'within the boundaries of New York City.'" *Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 623 (E.D.N.Y. 2012) (quoting *Shah v. Wilco Sys., Inc.*, 27 A.D.3d 169, 175 (N.Y. Sup. Ct. App. Div. 2005)). Similarly, NYSHRL "claims may only survive if [a plaintiff] adequately pleads that the [adverse] acts occurred in New York or that their impacts were felt in New York." *Hollington v. CDM Fed. Programs Corp.*, Case No. 22-cv-4940-ER, 2023 WL 2457057, at *12 (S.D.N.Y. Mar. 10, 2023). And the fact that Ms. Washington is a New York City resident is not sufficient to bring her claims within the reach of these statutes. *Mejia v. White Plains Self Storage Corp.*, Case No. 18-cv-12189-KMK, 2020 WL 247995, at *4 (S.D.N.Y. Jan. 16, 2020) (holding that courts have found that to maintain a NYCHRL claim, both residents and non-residents must allege that "the discriminatory *conduct* had its impact within the City"); *Hollington*, 2023 WL 2457057, at *11 ("A plaintiff's mere residence in New York is not sufficient to establish a NYSHRL claim.").

Ms. Washington contends that in *Hoffman v. Parade Publications*, 15 N.Y.3d 285, 289 (2010), New York's highest court held that the "impact test" does not apply to New York residents like herself. ECF No. 92 at 29. But that is not the holding of *Hoffman*. In *Hoffman* the court reversed a lower ruling expanding the geographic reach of the NYCHRL and NYSHRL and held that that *non-residents* must show that the discrimination actually had an impact on them in New York City/State rather than merely showing that the allegedly discriminatory termination decision was made there. 15 N.Y.3d at 289–91. The *Hoffman* court did not hold that *residents* are exempt from the impact requirement, as that was not a question before the court. And "other courts in the Second Circuit have noted that the same rationale—limiting the scope of the

NYCHRL to cases where the discriminatory conduct had its impact within the City—is 'equally applicable to claims brought by [City] residents.'" *Mejia*, 2020 WL 247995 at *4 (quoting *Robles*, 841 F. Supp. 2d at 624). "[T]o hold otherwise would create the same 'inconsistent and arbitrary results' that the *Hoffman* court was trying to avoid, i.e., the possibility of holding an employer liable under the NYCHRL 'based solely on its employees['] chosen residence.'" *Id.* (quoting *Robles*, 841 F. Supp. 2d at 624).

For these reasons, Ms. Washington's NYCHRL and NYSHRL claims will be dismissed without prejudice.

### D. Ms. Washington Has Not Adequately Alleged that NAMCO Is Her Employer

Defendants briefly allege that this Court lacks personal jurisdiction over NAMCO. But as part of this argument, Defendants contend that, regardless, Ms. Washington has not plausibly pled that NAMCO was her employer and is therefore not liable for her firing. The Court agrees with this latter point. While Ms. Washington alleges in a conclusory fashion that she was an employee of each of the Defendants, including NAMCO, and that they jointly employed her, ECF No. 54 ¶¶ 48, 50, 53, 56, 57, such conclusory allegations are insufficient, *Iqbal*, 556 U.S. at 678. Instead, Ms. Washington specifically alleges that it was 1776 Touring "that entered into employment contracts with cast members and paid wages." ECF No. 54 ¶ 71. And regarding NAMCO, she only alleges that it was involved in the production of the Show and helped subsidize it. *Id.* ¶¶ 2, 52, 70–71.

"[T]wo parties can be considered joint employers and therefore both be liable under Title VII if they 'share or co-determine those matters governing the essential terms and conditions of employment.'" *Butler v. Drive Auto. Indus. of Am., Inc.*, 793

F.3d 404, 408 (4th Cir. 2015) (quoting *Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213, 1218 (10th Cir. 2002) (*en banc*)). In determining whether two entities are joint employers courts consider

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* at 414. Ms. Washington has not made such allegations in the second amended complaint regarding NAMCO. Instead, she argues that NAMCO and 1776 Touring are a single employer, citing *Vance v. N.L.R.B.*, 71 F.3d 486, 490 (4th Cir. 1995), a case that dealt with unfair labor practices rather than discrimination claims. ECF No. 92 at 36–37. The factors considered in *Vance* regarding "whether two or more employing entities constitute a single employer" were "(1) common ownership, (2) interrelation of operations, (3) common management, and (4) centralized control of labor relations." 71 F.3d at 490. But even if these factors are relevant in determining the employer in the discrimination context, Ms. Washington does not point to any allegations in the second amended complaint that would realistically support those factors either.[5]

---

[5] Ms. Washington attached to her response a declaration and four exhibits consisting of the Show's Playbill, an email inviting her to audition for the Show, the Actors' Equity Association agreement and rules regarding "short engagement touring," and her termination notice. She argues that these documents, among other things, support her

Drawing all reasonable inferences in Ms. Washington's favor, even though she alleges that NAMCO was a producer, she also alleges that that "NAMCO contracted with NETworks to produce the Show," ECF No. 54 ¶ 71, that 1776 Touring "entered into employment contracts with cast members and paid wages," *id.*, and that she was fired by employees "of NETworks and/or 1776 Touring and/or Gentry," *id.* ¶¶ 58, 60, 178, 184. All of these allegations cut against joint liability. She has not alleged, for example, that NAMCO had authority to fire her, had day-to-day supervision over her, or dealt with her payroll, or that there was common ownership or management between NAMCO and the Defendants. Thus, Ms. Washington has not adequately alleged that NAMCO was also her employer, and NAMCO will be dismissed without prejudice.

## IV. CONCLUSION

The second amended complaint does not allege plausible facts to support discrimination claims under Title VII or Section 1981, but the retaliation claims under those same statutes are adequately pled. The New York state statutory claims fail because the alleged discrimination occurred and was felt outside of that state. And the second amended complaint does not allege that NAMCO was Ms. Washington's employer. As a result, Defendants' motion to dismiss will be granted in part and denied in part. Counts 1 and 3 for discrimination under Title VII and Section 1981 and Counts 5 through 8, the state statutory claims, will be dismissed without prejudice. NAMCO will also be dismissed without prejudice. The motion will be denied as to Ms. Washington's Title VII and Section 1981 retaliation claims in Counts 2 and 4.

---

claim that NAMCO and 1776 Touring are a single employer. Even if the Court were to consider these documents in connection with this motion to dismiss, they indicate only that NAMCO was a producer and do not plausibly support the factors listed above.

Date: September 23, 2026

/s/
Adam B. Abelson
United States District Judge